

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 10, 2026

**BY ECF**
The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:  *United States v. Alexander McGrail Reynolds*, 25 Cr. 135 (RA)

Dear Judge Abrams:

As untraceable 3D-printed ghost guns were becoming criminals' tools of choice, Alexander McGrail Reynolds trafficked 225 of these firearms. In doing so, he facilitated other felonies and endangered lives. This deliberate, illicit conduct is deserving of punishment commensurate with the gravity of the crime, and the Court should sentence the defendant to a Guidelines term of imprisonment of 60 months. This proposed sentence is fair and just, and any lesser sentence would fail to account for the seriousness of the defendant's conduct, would promote disrespect for the law, and would create unwarranted and unjust sentencing disparities.

## I.  Offense Conduct

In September 2023, the defendant opened his Etsy store, and approximately three weeks later he sold his first ghost gun. Over the next eight months he sold approximately 225 of them. By October 13, 2023, barely two weeks after he sold his first ghost gun online, the defendant had the following exchange with a customer. In the messages the defendant acknowledged he knew he was selling handgun frames and knew it was illegal to do so.

> Customer:  Are they really airsoft or that's just the description you used…. I was looking to get one for a Gen 3 g19 [Glock 19, 9mm handgun] if possible.

> Reynolds:  I don't believe it's legal to sell/buy non Airsoft items online. But what you use them for is your choice. I could do a gen 3 g19.

Two days later, on October 15, 2023, in another conversation with a customer, the defendant again made his intent clear: his marketing decisions were driven by an attempt to skirt firearms laws explaining that he labeled his products as for Airsoft use only "for online selling guideline purposes." PSR ¶ 17. Similar conversations with customers continued over the following months. On January 4, 2024, the defendant wrote to another customer, "[s]ince p80 [Polymer 80, a commercial ghost gun kit] is illegal to sell, I can advertise this only as airs[o]ft and say that they

are to scale. So how you use them is up to you!" PSR ¶ 17. When the defendant told this customer it was up to him how to use the defendant's ghost gun, the defendant knew that his customers were using his frames to build illegal, functioning firearms. The day after the defendant told one customer it was "up to you," how the customer used the defendant's ghost gun, a different customer wrote to him, the customer had just paid for "a 'real' g17 Gen 4 that would be required to have made from the strongest material you have as it will be used for a functional fire arm."

In a review that was left on the defendant's Esty store page in December 2023, the first photograph below showed the defendant's ghost gun converted into a functioning 9mm handgun, next to a 17-round magazine. The text accompanying the review read, "These frames are perfectly in spec. I've shopped here a couple times and I will continue to do so." *See* PSR ¶ 15.[1] The same customer left another review in February 2024 that showed two of the defendant's ghost guns built into operational firearms. That photo is the second one below.



*Etsy Review, December 2023*

---

[1] Records obtained via search warrant from Etsy show that this review was left on December 14, 2023, not on February 28, 2024.



*Etsy Review, February 2024*

In February 2024, a different customer left a review on the website saying "Great job this frame is good and solid work and interchangeable with airsoft and actual g_n parts." PSR ¶ 15. That same customer left multiple reviews and posted pictures of two of the defendant's ghost guns built out with firearms parts, which are shown below.

 

*Etsy Reviews, February 2024*

Overall, through Etsy, the defendant sold approximately 225 ghost guns. These sales were made in approximately 173 transactions. In addition to nearly 160 shipments across the United States, the defendant shipped ghost guns to Mexico once and to Canada thirteen times. Law enforcement agents identified eighteen shipments to the known home addresses of felons in the United States, and in an unrelated investigation, NYPD officers recovered three of the defendant's ghost guns during a search warrant execution on Staten Island in January 2024.

## II.    The Sentencing Guidelines

The defendant has pleaded guilty, pursuant to a plea agreement, to one count of illegal firearms dealing, in violation 18 U.S.C. § 922(a)(1)(A). The parties and Probation agree that the defendant's offense level is 27, which accounts for, among other factors, the defendant trafficking more than two hundred untraceable firearms across the United States and out of the country. The plea agreement incorrectly excluded from its analysis the defendant's March 2025 DUI conviction in California, for which he was sentenced to a three-year term of probation. Despite this California conviction preceding the guilty plea by six months, the defendant did not disclose the conviction during plea negotiations, to Pretrial when he was arrested and sentenced, to Probation during the PSR interview or review, or the Court during the change of plea proceeding. Nevertheless, the defendant, who has one criminal history point from his DUI conviction, remains in criminal history category I. The Guidelines sentencing range is therefore 70-87 months' imprisonment, but is capped at the statutory maximum sentence of 60 months. *See* U.S.S.G. § 5G1.1(a).

## III.    A Guidelines Sentence of 60 Months is Fair and Just

The Court should sentence the defendant to a Guidelines term of imprisonment of 60 months. This sentence is fair and just, and it is the minimum sentence the Court can impose that would meet the requirements of 18 U.S.C. § 3553(a).

Trafficking more than two hundred firearms into New York and elsewhere is a deadly serious crime that merits a significant, lengthy punishment. Focusing on New York and New York City, effective gun control measures have limited the availability of legally acquired firearms to be used in violent crimes. As a result, in a 2016 report, the New York Attorney General's Office found that 86% of firearms recovered in crimes came from outside of the state.[2] This 2016 study predated the proliferation of ghost guns, and particularly the 3D-printed variant at issue here, but the point is the same: Illegally sourced firearms are a massive threat to public safety. These illicit guns are the tools that are used to commit murders, robberies, domestic assaults, and a host of other violent crimes. And it is the defendant's gun trafficking, and the trafficking of others like him that enables all these other offenses.

The defendant's trafficking in 3D-printed, untraceable ghost guns only deepens the severity of his conduct and increases the need for the punishment to address the crime. In the past four years, in response to the growing threat of ghost guns, the Department of Justice, and the ATF in particular, worked to create and enforce regulations that would require serialization of ghost guns and prevent felons and others who would use them illegally from acquiring them. Criminals responded by turning to 3D-printing to evade these regulations.[3] Between 2017 and 2023, the number of ghost guns that were used in crimes recovered annually by law enforcement officers

---

[2] New York Attorney General's Office, *Target on Trafficking: New York Gun Crime Analysis* (https://ag.ny.gov/sites/default/files/reports/target-on-trafficking-2016.pdf).

[3] Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment*, *Volume Four, Part V: Privately Made Firearms, Updates and Analysis*, April 4, 2024 (https://www.atf.gov/media/18631/download).

has sky rocketed from 1,629 to 27,490.[4] The specific problem of 3D-printed guns in New York City is particularly acute, and in 2024, the last year for which data is available, 3D-printed guns accounted for a quarter of all ghost guns recovered in the city.[5] The rate at which these 3D-printed guns are being used to commit crimes is growing fast, and the threat goes beyond New York and New York City, to many of the places across the United States and North America where the defendant trafficked his guns.[6]  The lack of serialization on these so-called "ghost guns" makes impossible for law enforcement to track and trace the firearms, significantly undercutting the ability of investigators to attack trafficking patterns. The physical nature of the guns, which are constructed largely of plastic, also makes the guns harder to detect using traditional techniques, e.g., metal detectors.

Gun traffickers, and those who buy and use trafficked guns, have changed their patterns as the ATF and other law enforcement agencies have targeted and cracked down on illegal firearms. These criminals have evolved their conduct to use 3D-printed guns, with deadly consequences.[7] Firearms regulations exist for a simple reason: to keep deadly weapons out of the hands of those who will use them to do harm. But individuals like the defendant, who privately manufacture firearms, do so in a manner that escapes the safeguards of the federal firearms regulatory system. The increasing proliferation of 3D-printed ghost guns being sent to felons and other criminals across the country requires the Court to send a message to this trafficker and others like him that they cannot wantonly break the law and then hide behind the untraceable nature of the guns they distribute to evade responsibility. This conduct, which makes all manners of other violent crime possible, demands accountability. The defendant's actions undoubtedly enabled numerous acts of violence. The defendant gets no credit for the fact that no specific shooting, robbery, or assault can be tied to the use of his guns because this was precisely the point of manufacturing and selling untraceable guns. The harm caused by the defendant's crimes continues today as these untraceable guns almost certainly remain in circulation and will continue to do so for years to come.

Other courts sentencing gun traffickers have addressed the danger and severity of the conduct by imposing terms of imprisonment like that the Government recommends here.

In *United States v. Vasquez Jordan, et al.*, 22 Cr. 673 (LTS), Chief Judge Swain sentenced a trio of gun traffickers to terms of imprisonment of 90, 84, and 60 months. Those defendants collectively trafficked 51 firearms and 150 grams of methamphetamine from Ohio to New York in 2022. Two of the defendants, who were sentenced to 84- and 60-month terms of imprisonment,

---

[4] *Id.* at 5.

[5] Chip Brownlee, *New York City's Spike in 3D-Printed Guns Prompts Push for Tougher Laws*, The Trace, April 6, 2026 (https://www.thetrace.org/2026/04/3d-printed-guns-new-york-city-da/).

[6] Stefan Schaufelbühl *et. al.*, *The Emergence of 3D-Printed Firearms: An Analysis of Media and Law Enforcement Reports,* Forensic Science International: Synergy, 8 (2024): 100464, (https://www.sciencedirect.com/science/article/pii/S2589871X240).

[7] Department of Justice, *Luigi Mangione Charged With The Stalking And Murder Of UnitedHealthcare CEO Brian Thompson And Use Of A Silencer In A Crime Of Violence*, Dec. 19, 2024,        (https://www.justice.gov/usao-sdny/pr/luigi-mangione-charged-stalking-and-murder-unitedhealthcare-ceo-brian-thompson-and-use).

were found not to have known about the drug trafficking aspect of the scheme. The defendant who was sentenced to 60 months, Micky Colon Martinez, was the driver for two of the five gun running trips. Like the defendant here, Colon Martinez had an offense level of 27 and was in criminal history category I. *See* 22 Cr. 673, Dkt. 59 (Government's sentencing submission).

In *United States v. Barrera*, 24 Cr. 242 (RMB), Judge Berman sentenced a gun trafficker who sent completed handguns and non-regulated rifle components to Mexico to 80 months' imprisonment. Like the defendant here, Barrera had no prior criminal history, was an educated professional, had an offense level of 27, and was in criminal history category I. *See* 24 Cr. 242, Dkt. 37 (Government's sentencing submission).

In *United States v. Wilson, et al.*, 21 Cr. 249 (SHS), Judge Stein sentenced a crew of gun traffickers to sentences ranging from 18 to 120 months' imprisonment. Those defendants collectively trafficked approximately 89 guns from Georgia to New York. The straw purchaser in that case, Davaughn Wilson, who had a total offense level of 19 and was in criminal history category I, was sentenced to an above-Guidelines sentence of 48 months' imprisonment. *See* 21 Cr. 249, Dkt. 246 (Government's sentencing submission).

The Government recognizes that no comparison between cases is perfect, but the aggregate data from the Sentencing Commission, reflected in the PSR, further shows that most defendants who commit similar crimes to this defendant, and who share his limited criminal history, are sentenced to at least 60 months' imprisonment. *See* PSR at 15-16. The defendant, who was at the vanguard of trafficking 3D-printed ghost guns, is not less deserving of this sentence than the average defendant convicted of similar offenses, and none of the defendant's arguments are persuasive in suggesting otherwise. That the defendant trafficked in 3D-printed, untraceable guns, is aggravating, not mitigating. It does not matter that the people who purchased guns from the defendant needed to add a few more parts themselves after they received frames from the defendant. *See* Def. Mem. at 7. To the defendant's customers there was materially no difference between what the defendant sold them and buying a fully assembled gun. Those customers, including numerous felons, needed the defendant's frames to complete their firearms, and would have had functioning guns within 30 minutes or an hour of receiving the defendant's frames in the mail. The key factor the Court should consider about the defendant's guns is that they are designed and intended to be untraceable. Assembling them in two steps only furthers that goal.

The defendant further claims not to be "a gun enthusiast or gun owner." Def. Mem. at 1. This is irrelevant. The defendant's crime was not owning or using guns. It was illegally distributing guns, including to others who would use and possess them to commit crimes. It is no more relevant for a drug dealer to disclaim personal drug use than it is for this defendant to disclaim personal gun ownership.

The defendant also claims many times not to have appreciated fully the wrongfulness of his conduct. He wrongly says he "took zero steps to conceal his actions," Def. Mem. at 1, despite explicit communications with customers where he acknowledged he marketed his products as for airsoft use because he knew selling gun frames was illegal. The defendant also downplays when and how he learned that he was violating the law. The defendant describes certain communications where he likened a 3D-printed ghost gun to a phone case, *see* Def. Mem. at 5-6, but these statements do not help him. First, the defendant is the person who created the ghost guns at issue

and had the chance to inspect them and see that they were more than a hollow shell to slip on a gun. He also spoke the language of gun users in his communications with customers, such as the example above where he referred to at gen 3 g19, while communicating with a customer. His professed ignorance is not credible. And second, just two weeks after selling his first frame on Etsy, when asked to create and sell a Glock frame for a working firearm, the defendant said he knew it was illegal to do so but did it anyway, telling the customer only, "what you use them for is your choice." The defendant went on to sell more than 200 additional frames over the next seven months and continued to take actions to ensure that his gun pipeline would not be shut down by Etsy. The defendant's continued attempts to mitigate his culpability should cause the Court to question the extent to which he has truly accepted responsibility and therefore ensure that the imposed sentence is truly a deterrent. The defendant's comments at his guilty plea, in which it took multiple attempts for him to acknowledge the obvious fact that he knew he was breaking the law, and his statement to Probation that it took him *months* to realize he was acting illegally, *see* PSR ¶ 23, contrary to the record evidence, strongly suggest the defendant has not grappled with how serious his crimes were.[8]

Finally, the defendant's personal history, compared to others convicted of similar offenses, is not mitigating, and does not suggest the defendant's sentence belongs in the bottom half of similar cases. The defendant has a partial college education and years of work experience in coding and 3D printing. It was these very characteristics and this background that he relied on to traffic guns across the country. It does not help the defendant that he used a computer in the Bay Area to manufacture his guns and then shipped them through the mail, rather than riding a bus from Chinatown to South Carolina and returning with guns he bought at a store. Victims of violent crime do not care if the person who trafficked the gun that shot them had a college education. The harm is the same. In fact, in most ways, the defendant's history is aggravating. He cannot argue that his choices were the product of necessity or done to protect himself. The defendant's choices were entirely volitional, and they were dangerous. Sentencing the defendant to anything less than the median sentence that others in his same position receive would send exactly the wrong message. An unequal outcoming favoring the defendant would cause, not avoid, "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). And it would send the message that gun traffickers who create guns from positions of privilege behind computers are less deserving of punishment than those who traffic them on buses.

---

[8] The defendant's false claim in a post-arrest statement in August 2024 that he believed then that he was selling something akin to "a phone case for an airsoft pistol," Def. Mem. at 5, reflects a similar attempt to deflect blame.

## IV.    Conclusion

The defendant was a prolific trafficker of hundreds of 3D-printed ghost guns, and the Court should sentence him to a term of imprisonment of 60 months.

Respectfully submitted,

JAY CLAYTON
*United States Attorney for the*
*Southern District of New York*

by:    /s/ Andrew Jones
Andrew Jones
Assistant United States Attorney
(212) 637-2249